UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| NOEL SHUCK, | ) |
|       Plaintiff, | ) |
| v. | ) No. 1:20-cv-00322-JPH-TAB |
| PAUL TALBOT, <br> WEXFORD OF INDIANA, LLC, | ) |
|       Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Noel Shuck, an Indiana Department of Correction inmate, alleges that his treating physician and IDOC's former medical provider were deliberately indifferent to his serious medical needs in violation of 42 U.S.C. § 1983. Defendants filed a joint motion for summary judgment. Dkt. [49]. For the reasons that follow, that motion is **GRANTED**.

**I. Summary Judgment Standard**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has met its burden, "the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Spierer v. Rossman,* 798 F.3d 502, 507 (7th Cir. 2015). A disputed fact is material if it might affect the outcome of the suit under the governing law. Williams v. Brooks, 809 F.3d 936, 941–42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party.'" *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court may rely only on admissible evidence. *Cairel v. Alderen*, 821 F.3d 823, 830 (7th Cir. 2016). Inadmissible evidence must be disregarded. *Id.*

The Court considers assertions in the parties' statements of facts that are properly supported by citation to admissible evidence. S.D. Ind. L.R. 56-1(e). If a non-movant fails to properly rebut assertions of fact made in the motion for summary judgment, those facts are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts); *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (district court may apply local rules to deem facts unopposed on summary judgment). Additionally, the Court has no duty to search or consider any part of the record not specifically cited in the parties' statements of facts. S.D. Ind. L.R. 56-1(h).

## II. Facts and Background

The following facts are not in dispute except as noted.  At all times relevant to his complaint, Mr. Shuck was incarcerated at Pendleton Correctional Facility.

Dkt. 51-3 at 3 (Deposition Transcript of Noel Shuck).[1] Dr. Paul Talbot was the onsite physician at Pendleton, and was employed by Wexford of Indiana, LLC, the company that contracted with IDOC to provide medical treatment to inmates. Dkt. 51-1 at 1. Mr. Shuck alleges that Dr. Talbot and Wexford failed to adequately treat his hernia condition. Dkt. 51-3 at 5-6.

Mr. Shuck first submitted a healthcare request about his hernia on January 7, 2019. Dkt. 51-3 at 7. On January 10, 2019, he was seen at sick call where nursing staff observed a possible inguinal hernia on the right side of Mr. Shuck's groin as well as a possible ventral hernia. Dkt. 51-1 at 2. An inguinal hernia occurs when tissue protrudes through a weak spot in the abdominal muscles, and a ventral hernia occurs when a bulge of tissues protrudes through an opening of weakness in the abdominal wall muscles. *Id.* Medical professionals often use supportive devices as a primary course of treatment before considering surgery. *Id.*

At the time, Mr. Shuck was a utility worker at Pendleton, a role that required him to "carry 300 pounds worth of ice up two flights of stairs every day[.]" Dkt. 51-3 at 5. Mr. Shuck testified in his deposition that he was able to keep this job even though he had complaints of a hernia, and he continued in this role until May 2019 when he moved to a different dorm. *Id.* at 9–10.

On January 16, 2019, Mr. Shuck met with onsite nurse practitioner Elaine Purdue ("NP Purdue") to have his hernia evaluated. Dkt. 51-1 at 2-3. NP Purdue advised him to reduce the weight he was lifting, discussed pain management

---

[1] Mr. Shuck was moved to Miami Correctional Facility in May 2022. Dkt. 61.

3

with Mobic and Tylenol, and ordered a hernia belt for Mr. Shuck to wear. *Id.* at 3.

On February 4, 2019, Dr. Talbot met with Mr. Shuck for the first time. *Id.* Mr. Shuck informed Dr. Talbot that he had not yet received the hernia belt that NP Purdue had ordered. *Id.* During this visit, Dr. Talbot observed that Mr. Shuck's hernia was "small, nontender, and easily reducible." *Id.*; *see also* dkt. 51-3 at 12. Dr. Talbot confirmed that there was still an order in place for Mr. Shuck's pain medicine and submitted another request for the hernia belt. Dkt. 51-1 at 3. Mr. Shuck received the hernia belt "sometime in March of 2019." Dkt. 51-3 at 8

On April 17, 2019, Dr. Talbot again met with Mr. Shuck. *Id.* Mr. Shuck was not wearing his hernia belt during the visit. *Id.* During this visit, Mr. Shuck requested hernia surgery. Dkt. 51-1 at 3. Dr. Talbot evaluated Mr. Shuck and again found his right inguinal hernia to be reducible and nontender. *Id.* He further found no signs of an umbilical or abdominal hernia. *Id.* Based on his evaluation, Dr. Talbot counseled Mr. Shuck to start wearing his hernia belt at all times, and renewed Mr. Shuck's prescription for pain medication, and continued the treatment plan of monitoring for improvement after wearing the hernia belt consistently for a period of time as advised. *Id.*

On June 19, 2019, Dr. Talbot saw Mr. Shuck for an unrelated diagnosis of spinal fusion. *Id.* During that visit, Dr. Talbot ordered that Mr. Shuck's bottom-bunk pass be renewed for a year. *Id.* at 4.

On August 7, 2019, Dr. Talbot met with Mr. Shuck to discuss abnormal lab results. *Id.* Dr. Talbot does not recall Mr. Shuck reporting any concerns about his hernia during this visit. *Id.* Mr. Shuck testified in his deposition that he stopped complaining about his hernia between June and October 2019 because he "didn't want to waste [his] time" and he "knew that they weren't going to do surgery until [his hernia] got so bad that they couldn't deny [him] surgery." Dkt. 51-3 at 13; *see also* dkt. 58 at 10–11 (gap in healthcare request forms between April 2019 and October 2019).

On September 16, 2019, upon Mr. Shuck's request for a bottom-range pass, Dr. Talbot again evaluated Mr. Shuck and found that Mr. Shuck had no functional limitation and no medical indication for an order for a bottom-range pass. *Id.* Mr. Shuck still had an active order for a bottom-bunk pass due to his spinal fusion diagnosis. *Id.* Dr. Talbot noted no new findings regarding Mr. Shuck's hernia condition. *Id.*

On October 22, 2019, Mr. Shuck met with NP Purdue to discuss his hernia. *Id.* NP Purdue noted that Mr. Shuck was wearing his hernia belt during the visit, and Mr. Shuck reported that the hernia belt did not provide him much relief. *Id.* NP Purdue again advised Mr. Shuck against heavy lifting. *Id.* Because Mr. Shuck reported soreness, tenderness, difficulty urinating, and constant pressure near the site of the hernia, NP Purdue submitted an outpatient request for Mr. Shuck to be considered for hernia surgery. *Id.* at 4-5.

On November 25, 2019, Mr. Shuck had a surgical consultation with an offsite surgeon and the surgery was approved. *Id.* at 6. On November 27, 2019,

5

Dr. Talbot met with Mr. Shuck and approved him for year-long bottom-bunk and bottom-range passes. *Id.* After November 2019, Dr. Talbot stopped working at Pendleton and never met with Mr. Shuck again. *Id.* at 6–7. On or around December 23, 2019, Mr. Shuck underwent hernia repair surgery. *Id.* at 5.[2]

### III. Discussion

Mr. Shuck argues that Dr. Talbot was deliberately indifferent to his serious medical need by delaying surgery to repair his hernias. Dkt. 57 at 6-8. With respect to Wexford, he argues that Dr. Talbot's lack of adequate treatment was intended to save Wexford money. *Id.* at 9. Defendants argue that they are entitled to summary judgment because Dr. Talbot exercised his medical judgment in ordering on-site conservative care before surgery, dkts. 50 at 17-20; 59 at 2-4, and because Wexford cannot be held liable under a theory of *respondeat superior* for any alleged constitutional violations by its employee, dkts. 50 at 20-21; 59 at 2.

"Prison officials violate the [Eighth Amendment's] prohibition on cruel and unusual punishment if they act with deliberate indifference to a prisoner's serious medical condition." *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Defendants do not contest that Mr. Shuck suffered from a serious medical condition. Thus, the Court will focus solely on whether Dr. Talbot and Wexford were deliberately indifferent to Mr. Shuck's hernia.

---

[2] Mr. Shuck also submitted healthcare requests forms for ongoing issues with his hernias after this surgery. Dkt. 58 at 15–19. However, they are not relevant here as Dr. Talbot was not involved in his medical care after November 2019.

"As its name implies, deliberate indifference requires 'more than negligence and approaches intentional wrongdoing.'" *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)). "[T]he evidence must show that the prison official . . . knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Id.* Medical professionals are afforded "a great deal of deference in their treatment decisions," and "a constitutional violation exists only if no minimally competent professional would have so responded under those circumstances." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (cleaned up). "When a plaintiff's claim focuses on a medical professional's treatment decision, 'the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)).

### A. Deliberate Indifference Claim Against Dr. Talbot

Mr. Shuck alleges that Dr. Talbot exhibited deliberate indifference by failing to treat his hernias in a timely manner. Dkt. 57 at 6–7. He argues that because his surgery did not occur until 11 months after he first reported his pain and eight months after he first requested surgery, a jury could find that Dr. Talbot was deliberately indifferent to his condition. *Id.* Dr. Talbot responds that Mr. Shuck's treatment was medically appropriate under the circumstances. Dkt. 59 at 4.

"A delay in the provision of medical treatment for painful conditions—even non-life-threatening conditions—can support a deliberate-indifference claim so

7

long as the medical condition is 'sufficiently serious or painful.'" *Grieveson v. Anderson,* 538 F.3d 763, 779 (7th Cir. 2008) (citations omitted). But delays attributable to a defendant's medical judgment will not support a finding of deliberate indifference. *Howell v. Wexford Health Sources, Inc.,* 987 F.3d 647, 661 (7th Cir. 2021) (finding that delays in approving ACL surgery did not show deliberate indifference because the "decisions about how best to treat Howell's knee were based on" the doctor's recommendation to proceed "only if and when it became 'absolutely necessary'").

Here, the medical records reflect that, at the first visit in February 2019 Dr. Talbot determined the hernia should be treated through onsite conservative measures, including the hernia belt and pain medication, because it was "small, nontender, and easily reducible." Dkt. 51-1 at 3. However, the parties offer conflicting evidence about whether, after that appointment, Dr. Talbot ignored Mr. Shuck's reports of pain that should have alerted him to the need for surgical intervention before the referral in October.

Dr. Talbot relies on the medical records for his three additional appointments with Mr. Shuck between April and September during which either the hernia hadn't significantly changed or was not mentioned at all. Dkt. 50 at 14–18. At the April 17 appointment, Mr. Shuck requested surgery but Dr. Talbot found hernia remained "nontender . . . easily reducible" and counselled him to wear the belt. Dkt. 51-2 at 9–10. At the June 19 appointment, Dr. Talbot talked to Mr. Shuck about his spinal fusion but otherwise noted there were no new findings. *Id.* at 12–15. At the August 7 appointment Dr. Talbot talked to Mr.

8

Shuck about lab results but otherwise noted he had no abdominal tenderness or palpable mass. *Id.* at 16–18. At the September 16 appointment, Dr. Talbot talked to Mr. Shuck about his bottom-range pass but otherwise noted his activities of daily living were normal. *Id.* at 19–21. According to the records, it was not until October 2019 that NP Purdue noted the hernia had become non-reducible and referred him for a surgical consult. *Id.* at 21–22. Within two months after that he had been approved for and received hernia surgery. Dkt. 51-1 at 4–5.

Mr. Shuck argues that there is an issue of fact because Dr. Talbot "did not accurately record his statements about his pain." Dkt. 57 at 6. In support, he offers his declaration that at the June, August, and September appointments he tried to talk about his hernia pain with Dr. Talbot and requested surgery but Dr. Talbot ignored him. Dkt. 58 at 4–5. He also asserts that the healthcare request forms show that he had continued complaining about his hernia and that he needed surgery. Dkt. 57 at 8.[3]

However, Mr. Shuck's healthcare request forms correspond with this treatment timeline reflected in the medical records. The forms reflect that he raised his hernia-related concerns between January and April—which correspond to the hernia-related medical visits during that time—but also show

---

[3] To the extent that Mr. Shuck attempts to base his arguments on the alleged statements by an offsite surgeon that he would have benefitted from earlier surgical intervention, *see* dkt. 57 at 7, such statements are inadmissible hearsay and must be disregarded. *Cairel*, 821 F.3d at 830.

9

that he didn't submit another healthcare form about his hernias until October. Dkt. 58 at 7–11.[4]

To establish a claim of deliberate indifference, Mr. Shuck "must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Goodloe*, 947 F.3d at 1033. Even accepting that Mr. Shuck reported his hernia pain to Dr. Talbot at the June, August, and September appointment, he has not produced any evidence from which a jury could find that these reports would have caused a doctor exercising reasonable medical judgment to order surgery at any point earlier than October 2019 when his hernia finally became non-reducible. *See Johnson*, 5 F.4th at 826 (finding no deliberate indifference where, despite plaintiff's deposition testimony about his pain levels, he "failed to connect this evidence to defendants' treatment during the relevant time period.").

That is, Mr. Shuck has not adduced any admissible evidence to suggest that Dr. Talbot's medical treatment "was not actually based on a medical judgment." *Id.* at 825. Ultimately, what matters for a claim of deliberate indifference is "the totality of an inmate's medical care." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc); *Kaszuba v. Ghosh*, 580 F. App'x 486, 488 (7th Cir. 2014) ("[I]solated incidents of delay [do] not rise to the level of deliberate indifference."). The totality of Mr. Shuck's care reflects a conservative treatment plan between January and April 2019 when his hernia was reducible;

---

[4] While not argued by Dr. Talbot, Mr. Shuck's deposition testimony also lines up with this timeline. Dkt. 51-3 at 13 (testifying that between June and October he did not submit healthcare forms about his hernia because he knew Dr. Talbot "wouldn't do anything" until it got "to be so bad that he just couldn't deny me surgery. So that's why there's a little gap in there.").

10

no change in treatment between April and October 2019 when he did not submit healthcare requests about his hernia and nothing in his medical records during this time reflected a worsening condition; and then referral to an offsite surgeon and surgery between October and December 2019 when it was determined that his hernia had become non-reducible.

The record shows that Dr. Talbot exercised medical judgment throughout his treatment of Mr. Shuck's hernia. Although Mr. Shuck disagrees with Dr. Talbot's medical decisions, he has not presented evidence that Dr. Talbot's decisions were so poor as to constitute no medical judgment. Because no jury could find from the designated evidence that Dr. Talbot was deliberately indifferent to Mr. Shuck's hernia, Dr. Talbot's request for summary judgment is **granted**. *See Johnson,* 5 F.4th at 825.

### B. *Monell* Claim Against Wexford

Because Wexford acts under color of state law by contracting to perform a government function, *i.e.,* providing healthcare services to inmates, it is treated as a municipal entity for purposes of section 1983 claims. *See Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002). "[M]unicipal governments cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by their employees. They can, however, be held liable for unconstitutional municipal policies or customs." *Simpson v. Brown Cty.*, 860 F.3d 1001, 1005-6 (7th Cir. 2017) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978)). For Mr. Shuck to succeed on his policy claim, he must show that Wexford had a policy or custom

11

that caused a constitutional injury. If there is no constitutional injury, there can be no policy claim. *See Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007); *see also First Midwest Bank Guardian of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) (a plaintiff "must establish that he suffered a deprivation of a federal right before [private entity] fault, deliberate indifference, and causation come into play.").

In his response brief, Mr. Shuck argues that Wexford violated his constitutional rights by "employing [Dr.] Talbot." Dkt. 57 at 9.  Specifically, Mr. Shuck argues that "Wexford employed and continues to employ [Dr.] Talbot not to provide … adequate medical care, but to save [Wexford] money on care to increase [its] profits." *Id*. He also claims that Wexford "could have required [Dr.] Talbot" to pursue a different course of treatment. *Id*.  Mr. Shuck designates no evidence to support his argument.  *See id.*

The fact of Dr. Talbot's employment by Wexford is not evidence that Wexford directed or encouraged its employees to engage in unconstitutional practices. Mr. Shuck cannot bring a claim against Wexford based upon a theory of vicarious liability, *Simpson*, 860 F.3d at 1005-6, and Mr. Shuck has failed to point to identifiable policies or widespread practices to support his *Monell* claim. *See Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (holding that 4 incidents over approximately 11 months involving only the plaintiff was insufficient to show a widespread practice or custom). Accordingly, Wexford is entitled to summary judgment.

### IV. Conclusion

For the reasons explained above, the defendants' motion for summary judgment, dkt. [49], is **granted**. Mr. Shuck's claims against Dr. Talbot and Wexford are **dismissed with prejudice**. Final judgment consistent with this Order shall now issue.

**SO ORDERED.**

Date: 9/29/2022

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

NOEL SHUCK
160960
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Inmate Mail/Parcels
3038 West 850 South
Bunker Hill, IN 46914-9810

Douglass R. Bitner
Stoll Keenon Ogden PLLC
doug.bitner@skofirm.com

Rachel D. Johnson
Stoll Keenon Ogden PLLC
rachel.johnson@skofirm.com